Rufus C. Salley and Beulah S. Salley v. Commissioner.
Salley v. Commissioner
Docket Nos. 66155, 84860.
United States Tax Court
T.C. Memo 1962-80; 1962 Tax Ct. Memo LEXIS 227; 21 T.C.M. (CCH) 412; T.C.M. (RIA) 62080; April 10, 1962
*227 Held, amounts paid to an insurance company in 1954, 1955, and 1956 in the form of interest on purported annuity policy loans are not deductible. Knetsch v. United States, 364 U.S. 361 (1960), followed. Douglas W. McGregor, Esq., for the petitioners. Harold Friedman, Esq., for the respondent. BLACK Memorandum Findings of Fact *228 and Opinion Respondent determined deficiencies in the income tax of petitioners as follows: Docket
No.
Year
Deficiency
66155
1954
$49,838.89
84860
1955
23,109.58
1956
20,856.40
Petitioners deducted $97,919.94 in 1954, $60,888.32 in 1955, and $49,907.98 in 1956 purportedly as interest payments on loans against certain annuity policies. In the determination of deficiencies the Commissioner disallowed the deductions. Petitioners contest the deficiencies by appropriate assignments of error. The cases have been consolidated because of the identical question presented. The only issue involved is whether the amounts are deductible by petitioners as interest paid on an indebtedness within the meaning of section 163(a), Internal Revenue Code of 1954. Findings of Fact A stipulation of facts to which certain exhibits are attached was filed by the parties and is incorporated herein by this reference. In addition, Exhibit T from the case of William R. Lovett, Docket No. 71565, offered in evidence herein by oral stipulation is incorporated by this reference. Petitioners Rufus C. Salley and Beulah S. Salley are husband and wife *229 and timely filed joint income tax returns for all years involved with the district director of internal revenue, Austin, Texas. In view of the fact that the activities of Rufus C. Salley are those with which we are primarily concerned, the word "petitioner" shall be used hereinafter to refer to him. Petitioner is the president and treasurer of Sam Houston Life Insurance Company, sometimes hereinafter called Insurance, of Houston, Texas, and he is also the owner of approximately 50 percent of all shares of stock of Insurance. On July 25, 1952, petitioner wrote to the deputy commissioner of internal revenue and asked whether interest paid on money borrowed for partial payment of the premium on a single premium annuity contract was deductible as an interest expense and whether the gain upon the sale of the annuity, prior to maturity, to one other than the issuing insurance company, would be taxable as capital gain. By letter dated August 1, 1952, petitioner was advised that such amounts are deductible as interest expense under section 23(b) of the 1939 Code and that the sale of the annuity would result in capital gain under section 117(a)(1) of said Code. By letter dated November 23, 1953, the *230 deputy commissioner advised petitioner that the internal revenue service had received inquiries from other persons who referred to the letter of August 1, 1952; that petitioner had apparently circulated that letter and that revocation of the letter ruling was under consideration. The letter also stated that the Commissioner could not then advise of the extent to which any reliance upon the ruling would be recognized. By letter of June 29, 1954, the deputy commissioner advised petitioner that the letter ruling of August 1, 1952, was revoked and that a new conclusion of the Commissioner was published as Rev. Rul. 54-94, 1954-1 C.B. 53. The deputy commissioner also advised petitioner that deductions of interest paid during the period August 1, 1952, to November 23, 1953, would not be disallowed. Soon after the original letter ruling was sent to petitioner, Insurance from time to time advertised its "Annuity Savings Bonds" under the headings "Income Tax Reduction" and "Tax Sheltered Investment." A typical advertisement reads, in part, as follows: You can legally convert into a Capital Asset the money you are compelled to pay out in Income Taxes, through the purchase *231 of this Company's COPYRIGHTED ANNUITIES, with borrowed money. We will loan you on the sole security of the Annuity an amount equal to the Cash Value of the contract, which is always greater than the future annual premiums, and we charge only 3 3/4% interest on the loan. The interest paid is deductible for income tax purposes. The Cash Value of the Annuity increases at 2 3/4% compounded annually. An Annuity is a capital asset and qualified for capital gains. Sometime in 1952, petitioner and Insurance agreed to enter into certain transactions and sign certain documents. The following paragraphs set forth our further findings of fact and report these transactions as they appeared in form: In response to petitioner's applications, Insurance issued to petitioner five $200,000 single premium annuity savings bonds dated December 15, 1952, numbered A-12679 through A-12683, respectively. Each annuity savings bond provided in material part that: 1. It was being issued in consideration of the payment in advance of a single premium $200of in cash, and the execution of a contract loan agreement for $199,800. 2. The guaranteed cash value on the thirtieth anniversary thereof was to be *232 $419,400. 3. If the annuitant was living on the thirtieth anniversary date and the contract was still in force, the annuitant would receive an annuity of $4,508.55 per month. 4. The annuitant was authorized at any time after the first anniversary date to surrender the policy for its net cash value (the cash surrender value of the policy less any indebtedness). 5. The cash value of each policy per $1,000 of total premium was as follows: End of
Cash or
End of
Cash or
Contract
Loan
Contract
Loan
Year
Value
Year
Value
1
$1,025
16
$1,485
2
1,051
17
1,522
3
1,077
18
1,560
4
1,104
19
1,599
5
1,131
20
1,639
6
1,160
21
1,680
7
1,189
22
1,722
8
1,218
23
1,765
9
1,249
24
1,809
10
1,280
25
1,854
11
1,312
26
1,900
12
1,345
27
1,948
13
1,379
28
1,996
14
1,413
29
2,046
15
1,448
30
2,097
6. The increase in cash value was to be calculated on the basis of 2 1/2 percent per annum, interest compounded annually. 7. The annuitant was to be allowed to draw against the policy at any time in an amount not exceeding the cash or loan value for the end of the current contract year. 8. All loan interest payments *233 were to be due and payable annually in advance. The policy was to terminate if any loan interest was not paid within 31 days of its due date. The annuitant could, however, reinstate the contract within 5 years of any such termination by paying any such arrearage, plus a further sum calculated at 4 percent per annum, compounded annually on any such arrearage. 9. The policy had no cash value prior to the end of the first contract year. 10. The amount of monthly annuity payable on the maturity date was to be based on the net cash value at that time. 11. The policy was issued at age 58. Insurance contemporaneously accepted a note and assignment executed by petitioner for each of the above identified policies by which petitioner borrowed from Insurance $199,800 of the $200,000 premium due on each policy. Each annuity was the sole security for the respective loan. By check dated December 22, 1952, in the amount of $1,000 petitioner made a payment to Insurance of the initial cash premiums required of him on the five policies. By check dated December 22, 1952, in the amount of $27,472.50 petitioner made a payment to Insurance to cover one year's interest on the five annuity loans. *234 On or about April 28, 1953, petitioner received from Insurance a check in the amount of $15,000 called an "Additional loan on Annuity Nos. A-12679, A-12680, A-12681" and petitioner issued a check to Insurance in the amount of $262.19 called "Interest on Annuity Loans to Dec. 15, 1953, Nos. A-12679-80-81." In response to petitioner's applications, in December 1953, Insurance issued petitioner three additional single premium annuity savings bonds with the issuance dates back dated to July 15, 1953, numbered A-15435, A-15436, and A-15437, respectively. The contracts stated that they were issued at age 58. The single premium on each of the three annuities was $500,500. Each policy provided for a guaranteed cash value of $1,048,500 on its thirtieth anniversary. Petitioner again executed a contract loan note and assignment for each of the three new policies, each note being in the amount of $500,000. Petitioner issued a check to Insurance dated December 29, 1953, in the amount of $1,500 to cover the cash payments of $500 on each policy. By check dated December 29, 1953, in the amount of $37,500 petitioner made a payment to Insurance to cover the interest on the new loans. At a later *235 time petitioner issued a check to Insurance in the amount of $8,423.85 to cover the differential amount of interest due on annuity bonds numbered A-15435, A-15436, and A-15437 so that the rate of interest equaled 2.75 percent instead of 2.50 percent as covered by the check dated December 29, 1953. Insurance issued a check to petitioner dated January 6, 1954, in the amount of $56,000 called a loan against the cash value of all eight annuities. Thirty-six thousand dollars equals the amounts charged against the three newer annuities on Insurance's books. In response to petitioner's application, Insurance issued petitioner an annual premium 30-year maturity deferred annuity with optional maturity date on December 27, 1954, No. A-15937. The contract was issued at age 60. The first annual premium was $120,000 and the contract provided that the cash value at maturity was to be $5,634,145.20. In material respects the policy was similar to the policies previously issued except that the cash value increased at a rate of 2.75 percent of accumulated premiums instead of the 2.50 percent rate provided for in the other annuities. Petitioner executed another contract loan note and assignment *236 for a loan in the amount of $238,800 against this newest policy. Petitioner issued a check dated December 27, 1954, to Insurance in the amount of $11,050; $9,658.24 was designated as "interest" and the balance as "premium" on the latter annuity. On September 16, 1955, petitioner increased his loan on this annuity by $11,191.20. At this time he paid $1,260.25 as additional interest by check. This policy lapsed in 1957 and the loan was offset by the cash surrender value on Insurance's books. Annuities numbered A-12679, A-12680, and A-12681 had lapsed, were reinstated, and were finally assigned or sold to Insurance Securities Corp. by petitioner in 1958 for $18,200. They were eventually canceled in 1959 by a payment of $18,300 to Securities by Insurance. Rufus C. Salley was also president of Securities. During the years 1954, 1955, and 1956 petitioners reported adjusted gross income and taxable income as follows: Adjusted
Gross
Taxable
Year
Income
Income
1954
$101,661.55
None
1955
70,877.85
None
1956
60,917.97
$1,565.88
The transactions between petitioner, Insurance, and Securities had no economic or commercial substance apart from an intended *237 tax benefit. The claimed payments of $97,919.94, $60,888.32, and $49,907.98 in the years 1954, 1955, and 1956, respectively, were not, in substance, paid as interest. Opinion BLACK, Judge: Petitioner does not contest certain minor adjustments made by the Commissioner so that the only issue before us is whether petitioner may deduct alleged interest payments made in 1954, 1955, and 1956 to Insurance. There is a basic similarity between the instant case and Knetsch v. United States, 364 U.S. 361 (1960). However, petitioner contends that the cases are distinguishable on their facts and that the holding in the Knetsch case is not controlling herein. Both cases involve the issue of the deductibility of interest payments made by a taxpayer in connection with the purchase of annuities or annuity bonds with funds largely borrowed from Insurance. In the Knetsch decision, the Supreme Court held that the taxpayer could not deduct the amounts paid as interest on the borrowed funds where the taxpayer's continued borrowings kept the net cash value of the annuities at a nominal amount. The Court determined that as payments of "interest" the transaction was a sham. In substance *238 it seems to us that in arguing that the Knetsch case is not applicable, the effect of petitioner's argument is that the Supreme Court's decision in that case was wrong. There were three dissenting Justices who thought the decision was wrong. But it goes without saying that it is the majority opinion which we must follow, and not the dissenting Justices, however strongly we may respect their views. When that is done, we think we must sustain the determination of the Commissioner. See William R. Lovett, 37 T.C. - (Nov. 22, 1961). While we are convinced that the Knetsch decision is applicable and controlling here, there is one distinction between the cases that we believe merits some discussion. In the Knetsch case, the Supreme Court saw no reason to pass on a point made in an amicus curiae brief to the effect that the taxpayer in entering into the annuity agreements relied on ruling letters issued by the Commissioner to other taxpayers. In the instant case, petitioner, as an individual, presented his plan to the deputy commissioner and received the letter ruling described in the Findings of Fact. On November 23, 1953, the deputy commissioner notified petitioner that revocation of the *239 original letter ruling was under consideration and that the Commissioner could not advise the extent to which any reliance could be placed on the ruling. Subsequently, the ruling was revoked and notification thereof was sent to petitioner on June 29, 1954. The deputy commissioner also advised petitioner that deduction of interest on the annuity loans for the period August 1, 1952, to November 23, 1953, would not be disallowed. From the foregoing it is obvious that there is no issue with respect to a retroactive revocation of a letter ruling since the years involved are subsequent to the time the petitioner received the letter of November 23, 1953. While this issue has been raised somewhat indirectly, the only possible question presented, as we see it, is whether or not the respondent is estopped from disallowing the claimed interest deductions on single premium annuity bonds purchased prior to the Commissioner's letter of November 23, 1953. Any consideration of this issue is limited to the interest payments on loans on annuity bonds numbered A-12679 through A-12683 because annuity bonds numbered A-15435 through A-15437 which carried an issuance date of July 15, 1953, were back dated *240 and were actually issued in December of 1953. Petitioner's applications were not made until December 1953 and his check in payment of the initial premiums on these policies was dated December 29, 1953. In any event, we do not believe that respondent is estopped to deny the deduction as to interest paid on annuity bonds numbered A-12679 through A-12683. Estoppel has not been alleged by petitioner in any manner and it is a well settled proposition that estoppel must be affirmatively pleaded, William R. Collins, 18 T.C. 99 (1952), affd. 203 F. 2d 565 (C.A. 6, 1953). Furthermore, where there has been a ruling based upon a mistake of law it has been held that the Commissioner has the discretionary power to prescribe the extent, if any, to which the revocation shall be applied retroactively, Automobile Club of Michigan v. Commissioner, 353 U.S. 180 (1957). Since the revocation involved was only applied prospectively there can be no doubt that the Commissioner acted entirely within the limits of his discretionary powers. Inasmuch as we have found that the transactions were lacking in substance, it is not necessary for us to decide on the respondent's *241 alternative position that certain of the interest payments would not be deductible under the provisions of section 264 of the 1954 Code even if there had been economic substance to the transactions. Decisions will be entered under Rule 50.